IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs August 7, 2012

**JEROME SAWYER v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Lauderdale County**
**No. 6532      Joseph H. Walker, III, Judge**

**No. W2012-00351-CCA-MR3-HC  - Filed September 18, 2012**

Petitioner, Jerome Sawyer, appeals the summary dismissal of his petition for a writ of habeas corpus.  As grounds for relief, petitioner argues that the trial court improperly enhanced his eighteen-year sentence for aggravated sexual battery by applying enhancing factors, other than prior criminal convictions, not found by a jury.  The habeas corpus court summarily dismissed the petition, and we affirm the judgment of the court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Jerome Sawyer, Henning, Tennessee, Pro Se.

Robert E. Cooper, Jr., Attorney General and Reporter; Mark A. Fulks, Senior Counsel, for the appellee, the State of Tennessee.

**OPINION**

I.  Procedural History

Petitioner appealed his 2001 conviction for aggravated sexual battery to this court. Affirming the judgments of the trial court, this court found the following facts from trial:

[T]he defendant was described as a family friend of [the victim's mother][1] and her three children and as "god-daddy" to C.B., one of [her] daughters and the victim in this case. On October 22, 1999, the defendant came to the [ ] residence [ ] about 5:30 in the afternoon. [Mother] was at work. Present in the house were C.B., age six; her sister, N.C., age seven; her brother, C.C., age eight; Felicia Pullen, nineteen, who resided at the house with [mother's] brother and who was "babysitting" [the] children at the time; and Ms. Pullen's small child.

According to Ms. Pullen, the defendant went to C.B.'s bedroom to help her clean out her closet and throw away old shoes. Ms. Pullen testified that the defendant called C.B. to come to the bedroom, and he sent N.C. and Ms. Pullen's child out of the bedroom and into the living room, where Ms. Pullen was watching television. A few minutes later, Ms. Pullen sent N.C. back to check on C.B., and N.C. returned to report that C.B. and the defendant were reading a book; however, C.C. went to the bedroom door, peeked inside, and came back to the living to report to Ms. Pullen that the defendant had C.B. playing with his "privacy." Ms. Pullen "went and got her and . . . told her to sit on the [living room] couch until her mother got home." C.B. then went into the kitchen to get a bowl of cereal. Afterward, the defendant called C.B. back into the bedroom. Ms. Pullen sent N.C. to the bedroom to retrieve C.B. The defendant then emerged from the bedroom, and Ms. Pullen noticed via a bulge in his pants that his penis was erect. The defendant returned to the bedroom where C.B. was, and after five or ten minutes, Ms. Pullen saw C.B. "[shoot] across the hall with nothing on" and go into the bathroom.

At some point during these events, Ms. Pullen called [mother] at work, but [mother] had already left work to go home.

Ms. Pullen testified that, when the defendant arrived at the home, C.B. was dressed in the jeans and shirt that she had worn to school. When she emerged from the bathroom into which she had "shot" unclothed, she wore a dress with Dalmatians on it. She came into the living room and seemed about to cry. The defendant came into the living room and asked C.B., "[W]hat you got that frown on your face for? You better not tell nobody. I ain't going to buy nothing else."

---

[1] Consistent with this court's policy of protecting the identity of minor victims of sexual offenses, we will refer to the victim's mother as "mother" in this opinion, rather than by name, to avoid identification of the victim by familial association.

[Mother's] male friend, Gus, arrived at the residence at this time, and the defendant departed. Gus engaged C.B. in a conversation, and Ms. Pullen testified that C.B. stated that the defendant made C.B. "touch his thing" and that he touched her "down there." Ms. Pullen quoted C.B. as saying that "white stuff" had come from the defendant's penis. Ms. Pullen testified that she and Gus found C.B.'s jeans in the bedroom. She found "white stuff" on the zipper area of the jeans and observed that the jeans were wet in this area.

C.B. testified that when she first went into her bedroom with the defendant he unzipped his pants and took out his "nut-nut," which was "big." The defendant asked her to touch it, but she declined. He touched her in her vaginal area and on her bottom over her clothes. When he pulled her toward him, he pulled down her pants and underwear and touched these areas. C.B. testified that she saw something on her pants that looked like milk, but she denied telling anyone that she saw the "white stuff" come from the defendant. After she went to the bathroom to wash, she put on her pajamas, which she was wearing when her mother came home.

N.C. testified that the defendant came to the home to help her and C.B. clean the old shoes out of their closet. C.B. and the defendant were in the bedroom alone, and N.C. went to the door and peeked inside. She saw the defendant pulling on C.B.'s arm. She heard C.B. tell him to quit. Later, she saw C.B. go into C.C.'s room wearing a towel. N.C. saw C.B. emerge from the bathroom wearing jeans and did not see her wearing pajamas. C.B. looked mad. The defendant later came out of the bedroom and told C.B. not to look at him "like that." The defendant, who had something "poking" out in his pants, then left the home.

[Mother] testified that she was at work on the evening of October 22, 1999. She was scheduled to work until 10:00 p.m., but her boyfriend, Anthony Augustus, called early in the evening and asked her to come home. [Mother] left work and arrived home about 7:00 p.m. She found C.B. wearing a dress. C.B. told [mother] what happened, and [mother] called the police. When the officers arrived, [mother] showed them C.B.'s jeans and underwear that had been left laying in the floor. The officers collected the clothing and took C.B. to Memphis Sexual Resource Center.

C.B. was examined at the center, after relating to the nurse that her godfather had touched her in front and on her bottom. The examination was normal except for some red lines in the vaginal area and some swelling around

-3-

the anus. Even though the medical expert testified that these limited findings were consistent with a complaint of digital assault, she opined that the red lines could have been signs of irritation caused by fecal material that had not been cleaned from C.B.'s anal area and that the anal swelling was "nonspecific." She further testified that the laboratory report on C.B.'s jeans reflected that no semen was present on the jeans.

*State v. Jerome Sawyer*, No. W2001-01923-CCA-R3-CD, 2002 WL 31259485, at \*1-2 (Tenn. Crim. App. Aug. 27, 2002). Based on the evidence, petitioner was convicted by a jury of the Class B felony offense of aggravated sexual battery, and the trial court sentenced him to serve an eighteen-year sentence as a Range II offender. *Id.* at \*1.

Petitioner subsequently filed a petition for post-conviction relief, alleging ineffective assistance of counsel. He also claimed the post-conviction court erred by allowing trial counsel to be examined outside of petitioner's presence. The post-conviction court denied relief, and this court affirmed the court's ruling. *Jerome Sawyer v. State*, No. W2005-01813-CCA-R3-PC, 2007 WL 778828 (Tenn. Crim. App. Mar. 15, 2007), *perm. app. denied* (Tenn. Aug. 13, 2007).

In the instant petition for habeas corpus relief, petitioner challenged his eighteen-year sentence, alleging that the trial court improperly enhanced the sentence from the minimum of twelve years by applying enhancement factors, other than prior criminal convictions, that were not found by the jury. In sum, he alleged a *Blakely* violation. The habeas corpus court summarily dismissed the petition, ruling that any alleged constitutional violation would render the judgment voidable, not void, and that *Blakely* does not apply retroactively to cases on collateral appeal. It is from this judgment that petitioner now appeals.

## II. Analysis

The court's decision with respect to a petition for a writ of habeas corpus is a question of law that we review de novo without a presumption of correctness. *Hart v. State*, 21 S.W.3d 901, 903 (Tenn. 2000). Habeas corpus relief is available to a petitioner only in the limited circumstances when the judgment is void on its face or the petitioner's sentence has expired. *Id.* "A void judgment is one in which the judgment is facially invalid because the court did not have the statutory authority to render such judgment." *Id.* (quoting *Dykes v. Compton*, 978 S.W.2d 528, 529 (Tenn. 1998)). Conversely, a voidable conviction or sentence appears facially valid and requires the introduction of proof beyond the face of the record or judgment to determine its deficiency. *Taylor v. State*, 995 S.W.2d 78, 83 (Tenn. 1999) (citing *Dykes*, 978 S.W.2d at 529). The proper method for attacking a voidable

judgment is by a petition for post-conviction relief, not habeas corpus. *Id.* (citing *State v. McClintock*, 732 S.W.2d 268, 272 (Tenn. 1987)).

In habeas corpus proceedings, a petitioner must establish a void judgment or illegal confinement by a preponderance of the evidence. *Passarella v. State*, 891 S.W.2d 619, 627 (Tenn. Crim. App. 1994). A habeas corpus court may summarily dismiss a habeas corpus petition, without the appointment of counsel and without an evidentiary hearing, if the face of the record or judgment fails to indicate that the convictions or sentences are void. Tenn. Code Ann. § 29-21-109 (2000); *Hogan v. Mills*, 168 S.W.3d 753, 755 (Tenn. 2005).

Petitioner raises the sole issue of whether the trial court's enhancement of his sentence ran afoul of the principles enunciated in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Blakely v. Washington*, 542 U.S. 296 (2004), *Cunningham v. California*, 549 U.S. 270 (2007), and *State v. Gomez*, 239 S.W.3d 733 (Tenn. 2007). This court has previously determined that *Blakely*-type claims can not be litigated through attacks on collateral review. *Donald Branch v. State*, No. No. W2003-03042-CCA-R3-PC, 2004 WL 2996894, at *10 (Tenn. Crim. App. Dec. 21, 2004), *perm. app. denied* (Tenn. May 23, 2005). Likewise, we have held that *Blakely* should not be retroactively applied to cases that have become final on direct appeal. *Id.* Moreover, as this Court has previously held, "even if *Apprendi*, *Blakely*, and *Cunningham* could be applied retroactively, it would render the judgment merely voidable, and not void." *Billy Merle Meeks v. Ricky J. Bell, Warden*, No. M2005-00626-CCA-R3-HC, 2007 WL 4116486, at *7 (Tenn. Crim. App. Nov. 13, 2007), *perm. app. denied* (Tenn. Apr. 7, 2008).

Petitioner's sentence has not expired, and there is no basis upon which to presume that the trial court lacked jurisdiction to sentence him. Consistent with our opinions in *Donald Branch* and *Billy Merle Meeks,* we conclude that the habeas corpus court properly dismissed the petition for relief.

## CONCLUSION

Based on the parties' briefs and our review of the record, we affirm the judgment of the habeas corpus court summarily dismissing the petition for relief.

_____
ROGER A. PAGE, JUDGE